IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 12, 2005 Session

## RETAIL BUILDERS, INC. v. MARGARET LATHAM

An Appeal from the Circuit Court for Sumner County
No. 20350-C    C. L. Rogers, Judge

No. M2004-00771-COA-R3-CV - Filed December 22, 2005

This is a construction case. The plaintiff construction manager agreed to manage the construction of a restaurant for the defendant restaurant owner. Preliminary documents showed that the construction manager agreed to provide its services for a guaranteed maximum price. During construction, there were unanticipated problems that increased costs. After construction was completed, the construction manager sought payments from the restaurant owner over and above the guaranteed maximum price, but the restaurant owner refused to pay more. The construction manager filed this lawsuit against the restaurant owner, claiming that the parties did not enter into an enforceable contract, and that the restaurant owner should pay the construction manager the reasonable value of its services under a theory of *quantum meruit*. After a bench trial, the trial court held in favor of the restaurant owner, determining that the parties had entered into a binding fixed price contract. The construction manager now appeals. We affirm in part and reverse in part the trial court's determination and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is
Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Robert L. DeLaney, Nashville, Tennessee, for the appellant, Retail Builders, Inc.

Curtis M. Lincoln, Hendersonville, Tennessee, for the appellee, Margaret Latham.

### OPINION

Plaintiff Retail Builders, Inc. ("RBI"), is a construction company that is in the business of building and renovating restaurants. Joseph Embury ("Embury") is the president of RBI. In some instances, RBI works as a general contractor, participating in the actual construction. In other

instances, RBI provides construction management, where RBI often does not participate in the construction, but rather coordinates and supervises the construction.

In 1998, Defendant/Appellee Margaret Latham ("Latham") met with Embury to discuss Latham hiring RBI to manage the construction of a restaurant called "The Light House." The construction project became known as "The Light House Restaurant Project" ("the Project"). Later, Embury delivered to Latham a standardized "AIA Document"[1] entitled "Standard Form of Agreement Between Owner and Construction Manager," 1991 Edition. It is undisputed that neither party signed the AIA document.[2] The parties dispute, however, whether handwritten notes were added to the AIA document reflecting Latham's agreement to pay RBI 10% of the actual cost of work performed by RBI during the construction of the Project with a "[g]uaranteed maximum price under Amendment 1 Article 1."

Latham hired Charles Hasty ("Hasty") as the engineer on the Project, and she hired Tom Anderson ("Architect Anderson") as the architect. She contracted with both Hasty and Architect Anderson to pay them directly for their services. RBI had no obligation to pay for the services of either Hasty or Architect Anderson out of the construction funds it was to receive.

In approximately May 1998, Latham sought to finalize financing for the Project. To obtain the necessary loan, she needed a document to present to the First Independent Bank ("Bank"). Toward this end, on May 12, 1998, before plans for the Project were completed, the parties executed a one-page standardized document entitled "Amendment No. 1 To Agreement Between Owner and Construction Manager" ("Amendment"). The Amendment provided:

> Pursuant to Paragraph 2.2 of the Agreement, dated May 12, 1998, Margaret Latham *(Owner)* and Retail Builders, Inc. *(Construction Manager)*, for The Light House Restaurant Project *(The Project)*, the Owner and Construction Manager establish a Guaranteed Maximum Price and Contract Time for Work as set forth below:
> 1. $650,000.00 (Six hundred and fifty thousand dollars) guaranteed maximum price.
> 2. 120 day contract time.

Article I of the Amendment contained provisos stating that "Contract Documents (plans) not completed," and that the "Guaranteed maximum price [is] based on incomplete plans, meetings with Owner and allowances itemized on Exhibit B." Exhibit B is a list of nineteen (19) items and the respective cost allowance for those items totaling $650,000. Exhibit B states that the estimates were based on an April 6, 1998 site plan/landscape plan developed by Hasty, on preliminary drawings done by Architect Anderson in April 1998, and on discussions with Latham. Included in the list of

---

[1] "AIA" is the American Institute of Architects.

[2] In earlier proceedings in this case, on August 27, 2001, the trial court had ruled that the arbitration clause in the AIA document was unenforceable, because there had been "no meeting of the minds, no signed contract, and no oral agreement for any binding arbitration."

items were $57,000 in profit and overhead for RBI and $21,000 for contingencies. The Amendment purports to amend an "Agreement" dated May 12, 1998; however, there is no signed "Agreement" in the record, only the unsigned AIA document. No other written instruments were signed by either party at any time before or during construction.

Based in part on the Amendment, Latham obtained a $900,000 loan from the Bank. The loan was comprised of two parts — $650,000 for construction, and $250,000 for "Design, Furniture, and Equipment."[3] Latham was responsible for administering the $250,000 portion of her loan. As is explained below, the Bank administered the $650,000 upon application for payment from RBI.

Architect Anderson's first set of architectural plans were dated May 20, 1998. Those plans classified the restaurant as a Type 6 building, which can be composed of wood. However, the City of Hendersonville interpreted its building codes to require that the restaurant be a Type 5 building, which must be built with noncombustible materials. In light of this, the plans were modified to make the structure a Type 5 building. Though RBI would later claim that it takes longer to build a Type 5 building, no changes were made to the 120-day completion time set out in the Amendment.

In addition, during the excavation process, rock was discovered where the foundation of the building was to be laid. Therefore, to avoid having to blast the rock to make way for the foundation, the plans were modified to raise the structure a few feet.

On August 4, 1998, the building permit for the Project was issued, and construction commenced soon thereafter. RBI, as the construction manager, received the invoices for all labor and materials expended on the Project. RBI engaged all of the subcontractors and purchased the construction materials used on the Project. As indicated above, RBI periodically prepared documents entitled "Application and Certificate for Payment" ("application for payment") and submitted these to Latham, the architect, and the Bank for approval and payment. Each application for payment recited that the "original contract sum" was $650,000. Each application for payment also listed the amount completed, the amount due, and the remaining balance on the contract. Attached to each application was a continuation sheet with a list of nineteen (19) items to be completed and the projected cost for each item that mirrored Exhibit B of the Amendment. In one column, the actual amount expended on each item was listed. In this way, the actual cost of the Project could be compared with the budgeted price as of the date of each application for payment. Ultimately, RBI submitted eight (8) of these applications. Each were approved by the architect and were funded by the Bank The final application, dated January 12, 1999, reflects that the total cost on the Project was $656,342, and that there was no balance due on the contract.

The restaurant opened on December 31, 1998. At that time, there were a few remaining minor construction items, which primarily involved landscaping. These were completed by January 28, 1999.

---

[3]The loan was paid down to $550,000 by the Small Business Administration.

After construction was completed, RBI requested that Latham pay for additional costs incurred on the Project substantially over and above the $650,000 contract price. Latham had paid RBI a little over $656,000, and she refused to pay any additional amounts for the cost overruns, relying on the "maximum price" of $650,000 set out in the Amendment.[4]

On June 20, 2002, RBI filed this lawsuit against Latham for breach of a written contract, breach of an oral contract, breach of an implied contract and breach of the obligation to deal in good faith. In the alternative, RBI sought damages based on *quantum meruit*, the value of services provided. In the complaint, RBI alleged that Latham was repeatedly informed that the budget allowances were in danger, and that she owed RBI for the cost overruns. It alleged that some of the additional costs on the Project resulted from unanticipated factors, such as the change in building type required by the city's building code and the excess rock found at the site where the foundation was to be laid. RBI also contended that additional costs arose out of items requested by Latham during construction that were not in the original price, such as furniture, fixtures, and equipment. RBI asserted as well that its labor costs increased during the final six weeks of the project, because Latham's accountant had insisted that the restaurant must be open before the end of 1998, and meeting this deadline required that crews work overtime. RBI conceded that "[n]o written change orders were prepared for these costs." It claimed, however, that Latham was informed of and had approved all of the additional costs. RBI asserted that the cost overruns totaled approximately $112,000; however, it requested $57,000, the amount of profit originally contemplated in the contract, plus the $30,000 that was spent on furniture, fixtures, and equipment. On September 9, 2002, Latham filed an answer and a counterclaim for damages resulting from claimed deficiencies in construction.

On January 26 and 27, 2004, a bench trial was conducted in the matter. Embury testified at trial about his dealings with Latham. He said that he helped Latham develop her concept for the restaurant, plan the layout, and develop a preliminary budget. The preliminary budget included four categories of expenses: construction ($511,773); site work ($96,320); furniture, fixtures, and equipment, also called "F, F, and E" ($247,700), and start up costs ($38,950), which totaled an estimated $894,743 for the entire Project.

Embury stated that he told Latham that his price for the Project would be ten percent (10%) of the actual cost of construction. This fee was reflected in the standardized AIA document that he gave to Latham, which he claimed he reviewed with Latham in detail. Embury recognized, however, that his handwritten notes on the AIA document provided for a guaranteed maximum price "under Amendment I Article I."

Embury testified that he signed the Amendment on May 12, 1998, in order to accommodate Latham's need to have a contract to show the Bank in order to "wrap up her financing." He said that he explained to Latham that he could not give her a contract cost because the plans were not complete. Nevertheless, Embury testified, Latham insisted that Embury provide her with a contract

---

[4]Latham makes no claim for the amount that she paid RBI in excess of $650,000.

to take to the Bank. Because of Latham's insistence, Embury said, he filled out the Amendment, reflecting a maximum guaranteed price of $650,000, but he qualified the price by adding the proviso that it was based on incomplete plans. Exhibit B, Embury explained, was an itemization of the construction cost allowances based on Hasty's site plan developed on April 6, 1998, as well as Architect Anderson's preliminary drawings of the plans drawn in April 1998. The $57,171 in profit itemized in the exhibit was 10% of the total of the other figures. Embury said that he reviewed the first set of plans with Latham. He said that the cost of construction was increased because of the change in the plans from a Type 6 building to a Type 5 building. Embry asserted that construction of a Type 5 building was more labor intensive and more costly. He maintained that he explained this difference in cost to Latham, and that, although he did not "recall her reaction, . . . the indication was we were to proceed." Embury was not aware of any discussions between Latham and Architect Anderson regarding the change in the building type. The final plans were completed on June 9, 1998.

Embury also testified about the rock in the foundation site that was discovered soon after excavation began. He said that Latham was called to the site to see the problem and discuss alternative solutions. Ultimately, it was decided that raising the elevation of the restaurant building would be less costly than blasting the rock to lay the foundation. Therefore, the building was elevated, and the front porch was converted from a concrete slab to an elevated wooden deck. Embury estimated that the additional cost to raise the building was about $23,000. Embury said that Latham was made aware of the changes and was told that "it will cost more money." Latham responded by "nodding and what we took to be – go ahead and do it."

Embury also claimed that Latham agreed to pay for the millwork provided by subcontractors on the project. He noted that there was no item in Exhibit B indicating that RBI had a commitment to provide the millwork, or "F, F, and E," a reference to furniture, fixtures and equipment, which "can include everything from a hostess counter to — to bars." Embury said that he had discussed the matter with Latham and had explained to her that she could get those items at a lower price by dealing directly with a cabinet maker. He said that Latham agreed to do so and indicated that she would also bid out the cabinetry and the doors. Later, however, Latham was unable to get bids for the millwork, so she asked Embury to "do the millwork and bars and such as that." The additional millwork, Embury stated, involved other items dictated by an interior decorator hired by Latham, such as false beams on the ceiling and special paneling on the walls. Embury said that he reminded Latham that the millwork was not part of their contract, and that there was no money in their contract for building the bars and the other items. Embury testified that Latham responded, "the bank will only loan me $650,000." Embury said that Latham "agreed we needed to go ahead and do it."

Latham also needed to buy equipment for the restaurant. Embury testified that she asked him whether he worked with any equipment companies. Embury recommended that Latham contact Ed Campbell, an equipment dealer, who had worked on other projects with Embury. Campbell was paid directly by Latham, not by RBI.

Embury testified about other changes that were made during construction that he alleged increased costs and were approved by Latham. He said that the initial plans showed multi-panel windows across the front of the elevation of the building; these were changed to French doors. The original plans included a stairwell from the kitchen to the basement; later plans eliminated those stairs, resulting in increased cost. Because of the rock in the ground where the foundation was to be, running the sewer and water lines involved an added expense. Unidentified factors also contributed to costs that were added to the electrical contract. In addition, in December 1998, shortly before the restaurant was scheduled to open, inclement weather and below freezing temperatures halted progress on the landscaping and paving. Consequently, to enable the restaurant to open prior to the end of the year, RBI posted a $45,000 cashier's check with the City for a temporary use and occupancy permit. The check was released after sixty (60) days. Embury asserted that Latham was informed about the additional costs related to all of these items, and said in fact that several of the changes were dictated by Latham or her management team.

Embury compiled a list of the extra costs on the Project that were caused by the various circumstances described in his testimony. They are as follows:

| | | |
|---|---|---|
| 1. | Site Costs | $16,779 |
| 2. | Additional landscaping and changes to landscaping | $2,430 |
| 3. | Rock at footings/drilling/rock removal | $23,677 |
| 4. | Structural steel changes | $450 |
| 5. | Add'l labor and materials required by "type change" | $14,433 |
| 6. | Changes of window to French doors | $419 |
| 7. | Plumbing changes | $4,150 |
| 8. | Electrical changes | $4,135 |
| 9. | Change of entrance to wooden deck | $3,815 |
| 10. | General condition additions such as insurance, supervision, overtime, bonding, and clean up labor | $8,740 |
| 11. | Furniture/fixture/equipment and decor | $30,603 |

These additional costs totaled $109,109,631. Embury testified that the amounts claimed by RBI for the extra costs were reasonable.

Embury also identified the eight applications for payment submitted by RBI, which were admitted into evidence. He said that they were generated in his office as the invoices arrived in his office for payment. Embury sent copies of the applications to Latham for her records, to Architect Anderson for approval, and to the Bank for payment.

The last application for payment was dated January 12, 1999. It included the same listing of items as in the other applications, except that it included two additional items: Equipment and Furniture. These items were not included in the original list, and therefore no amount was budgeted for them. In the January 1999 application, RBI charged Latham $6,527 for "Equipment," and $22,239 for "Furniture" according to this application. This application also reflected that RBI had

earned $57,053 for "Profit and Overhead," out of a budgeted $57,171, during the course of the Project. The January 1999 application for payment showed that the total amount to be paid to RBI was $656,342, that there were no change orders, and that there was no balance due on the contract. Embury conceded that he did not have any discussions with Latham about the increased costs when she was sent this last application for payment, but insisted that they had previously "had some pretty serious discussions about where the price of the project was going." Embury said that Latham indicated that the Bank would lend only $650,000 for construction, and commented that perhaps she could sell some of her property or get money from her retirement fund to pay the costs over that amount.

Embury testified that, after the January 12, 1999 final application for payment was submitted, another $68,207 in invoices on the Project were received and paid by RBI out of RBI's funds. Embury submitted into evidence a document, Exhibit 19, listing the invoices that were paid after January 12, 1999 by RBI. At the trial, RBI was prepared to offer some, but not all, of the invoices to corroborate its payment of those amounts.

Through Embury, RBI proffered as evidence a letter dated March 4, 1999 from Embury to Latham. RBI claimed the letter demonstrated that Latham had agreed to pay RBI an additional $80,113 over and above the $650,000 in twelve (12) payments of $6,676.08. RBI contended that Latham had stopped these monthly payments after making the first payment. Latham objected to the admission of the letter into evidence. The trial court concluded that the March 4, 1999 letter was an attempt at compromise and settlement, and disallowed its admission into evidence on that basis.

Latham also testified at trial. She said that when she began talking with Embury about RBI managing the construction of the restaurant, she discussed with him the difference in a cost-plus contract and a guaranteed price contract. She said that Embury told her that a cost-plus contract could potentially be less expensive, but she nevertheless chose the fixed price contract. Latham received the standardized AIA document from Embury, but she said he did not go over it with her and she did not recall any handwritten notes on her copy. Latham said that she signed the Amendment because it contained the guaranteed maximum price of $650,000, and that she never expected that she would owe RBI more than that amount. She maintained that she never received from RBI any change orders, invoices, or other documents during construction, other than the applications for payment with the continuation sheets attached. Latham received all eight applications for payment. She pointed out in her testimony that the applications for payment showed that her cost stayed below the maximum price of $650,000 until the final application in January 1999.

Latham testified that, during the course of construction of the restaurant, Embury assured her that the Project was within budget, saying, "[i]t's looking good. It looks like we're coming in under." She acknowledged that Embury told her that changes needed to be made, but said that he indicated that the changes would save her money. Latham claimed that she did not become aware that Embury wanted to be paid more than the $650,000 maximum price until December 1998, when he "started hinting . . . it might be a little bit over, but he never did say how much." She said that

Embury finally told her how much she was over the $650,000 maximum in late February or March 1999. Latham claimed that, if she had known about the overage during construction, she would have cut items from the Project to keep it from going over budget. Latham said that, prior to trial, she had not seen the list of cost changes compiled by Embury and introduced into evidence, nor had she seen the March 4, 1999 letter purportedly sent to her by Embury. After the lawsuit was filed, RBI sent counsel for Latham some of the invoices reflecting costs on the Project, which totaled $279,597.85.

Latham testified that she assumed that, whether the restaurant was classified as a Type 6 or Type 5 building, it would be built with fireproof material, and indicated that she did not discuss with Embury any increase in price associated with the change in the building type. With respect to the rock discovered where the foundation was to be laid, Latham said that Embury told her that she could save between $20,000 and $30,000 in blasting costs by elevating the restaurant a few feet. She conceded that Embury indicated that there would be difficulties in underground plumbing, but asserted that he later told her that he had figured out a way to work around it. Latham insisted that Embury did not tell her that the problems with the rock would cause her to owe him more than the maximum price. In fact, she stated, the $21,000 contingency in the budget was based on the fact that rock was discovered, and this amount was intended to cover the related costs. By choosing not to blast the rock, Latham thought that this contingency money could be used for other items.

Latham said that her decorator did some of the work on the bartops, and that RBI finished them by laminating them. Latham paid her interior decorator directly. Because finishing the bartops was in the original plans, she assumed that this would be RBI's responsibility.

Latham said that there were certain expenses that she was not told she would have to pay over and above the maximum $650,000, such as costs for the architect, the engineer, a sewer tap and a fire hydrant, which cost about $43,000. Latham testified that she paid those expenses out of the $650,000 loan, and consequently had to make the final payments to RBI out of her personal checking accounts. In June 1999, Latham wrote Embury a note telling him that she did not intend to make any more payments to RBI over the contract price.

On cross examination, Latham was asked about the Amendment she signed and whether she was aware of the proviso that the stated maximum guaranteed price was based on incomplete plans. She said that, at the time she signed the Amendment, she "didn't really read" the provision stating that the plans were incomplete, and said that Embury did not tell her that the maximum price was based on incomplete plans. Latham said that she told Embury at the time that she had only $650,000 for construction. She suggested in her testimony that Embury could have added the "incomplete plans" language to the Amendment after she signed it, but admitted that the first set of plans was dated May 20, 1998, one week after the Amendment was signed. She was asked about a separate continuation sheet submitted to the Bank in support of the $250,000 portion of her loan designated for "Design, Furniture and Equipment." She recognized that the continuation sheet showed that the architect, engineer, kitchen equipment, and furniture were to be paid from the $250,000, not from the $650,000 loan designated for construction. When asked about the bar, booths, hostess stand, and other similar items that RBI completed, Latham said that, because these items were built into the

floor, she thought that they were part of the building. Latham maintained that she did not remember Embury telling her that she would owe him separately for that work.

Latham testified that she needed more equipment, and that Embury sought to obtain it from Ed Campbell in South Carolina. She agreed that Embury was not responsible for getting equipment.

Tom Anderson, the architect on the Project, testified as well. Architect Anderson confirmed that he changed the architectural plans to make the restaurant building a Type 5 building, rather than a Type 6, but he was unsure about the cost difference. When rock was discovered on the job site, where the foundation was to be laid, Architect Anderson discussed the situation with Embury, but not with Latham. He testified that the Project was completed in a workmanlike fashion and according to the requirements and specifications of the plans that he drew.

Ed Anderson ("Ed Anderson"), RBI's construction superintendent, also testified at trial.[5] He stated that his job was to oversee the contractors on the construction of the Project. Ed Anderson testified about some of the cost increases associated with constructing a Type 5 building as opposed to a Type 6 building. He stated that using the metal studs necessary for the Type 5 building structure took more time to install than those used in a Type 6 structure. Though he did not know the cost effect of the building type change in this Project, he said that in other jobs he had worked on, it would double the cost of construction. Ed Anderson testified that he was on the jobsite every day, and that he was aware of the conversations between Embury and Latham. Because Latham's business was just down the road, Embury would go talk to Latham whenever an issue needed to be addressed.[6] He recalled the problem with the rock on the site, and noted that Latham was aware of the problem. Ed Anderson testified that, as the construction continued, Latham asked RBI to build custom bars upstairs and downstairs, install booths, decorate, hang pictures, and other such tasks. Ed Anderson did not know whether those tasks were contemplated in the original contract. He asserted that a good deal of overtime was worked on the Project in an effort to open the restaurant by the end of 1998. Like Architect Anderson, Ed Anderson believed construction on the Project was done in a workmanlike fashion consistent with the plans and specifications.

The deposition of equipment dealer Edward C. Campbell ("Campbell") was admitted into evidence to show his involvement in the project.[7] Campbell testified that he had worked with Embury on projects in the past, and that Embury had contacted him to obtain some kitchen equipment for the Light House Project. Campbell had a couple of meetings with Latham and then with the general manager of the restaurant, Travis Roberts ("Roberts"). Eventually, he sold Latham

---

[5]Ed Anderson is not related to Tom Anderson, the architect.

[6]Latham owned a BP Gas station about 200 or 300 yards from the site of the Project, and she operated from there.

[7]The trial transcript shows that Campbell was scheduled to testify at trial, but was prevented from appearing because of harsh weather conditions. The parties took a post-trial deposition and submitted it to the trial court instead of requiring Campbell to appear in person.

about $120,000 worth of equipment.[8] He said that the vent hoods were furnished by RBI. He also stated that RBI installed the equipment because he, Campbell, was too expensive and Embury had employees who could do it. Campbell said that the price of the equipment did not include installation costs.

On March 10, 2004, the trial court entered an order finding in favor of Latham and against RBI on its complaint. The trial court stated, "The Court specifically finds that the contract was a fixed price construction contract, the Plaintiff gave continuous assurances, both orally and by documentation, and allegations by Plaintiff of extras or additions was not shown by a preponderance of the evidence in light of the exhibits and testimony." The trial court later amended its order to confirm that it was also dismissing Latham's counterclaim. From that order, RBI now appeals.

On appeal, RBI argues that the trial court erred in concluding that the parties had entered into a fixed price construction contract. RBI contends that the Amendment was too indefinite as to material terms to be enforceable, and notes that the parties did not execute any other written agreement. RBI claims that the Amendment could not be considered a final contract, because it provides specifically that it was based on plans that had not been completed. RBI also argues that the proof shows that it incurred $30,000 in expenses on furniture, fixtures, and equipment which were beyond the scope originally contemplated by RBI and Latham. Because there was no enforceable contract, RBI argues, the trial court should have imposed a quasi-contractual obligation upon Latham to pay RBI a reasonable amount to prevent unjust enrichment. RBI contends that additional compensation in the amount of $80,113 would be reasonable compensation. RBI further argues that the trial court erred in disallowing the admission into evidence of the March 1999 letter, in which RBI claims that Latham agreed that she should pay RBI $80,113 for the additional goods and services provided by RBI.

In response, Latham argues that the Amendment constituted the parties' agreement, and that the guaranteed maximum price of $650,000 is enforceable. She further argues that, even if there was no written contract between the parties, there was an oral agreement that RBI perform its services for a guaranteed maximum price of $650,000, as is evidenced by the Amendment and by RBI's applications for payment. Moreover, even if no contract existed between the parties, Latham contends, the approximately $657,000 that she has already paid RBI is more than reasonable compensation for RBI's services.

We review the trial court's factual findings *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. We review questions of law *de novo*, with no such presumption of correctness. Tenn. R. App. P. 13(d); *see Strickland v. Cartwright*, 117 S.W.3d 766, 771 (Tenn. Ct. App. 2003).

Our Supreme Court has explained that a contract must be sufficiently definite in order to be enforced:

_____

[8]Campbell later testified that the supplies could have cost $96,284, but he could not remember the exact price.

A contract must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced. Indefiniteness regarding an essential element of a contract may prevent the creation of an enforceable contract. A contract must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties.

*Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (citations and quotations omitted). In determining whether the parties mutually assented to the terms of a contract, "courts must apply an objective standard based on the parties' manifestations." *Staubach Retail Servs.-Southeast, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. Ct. App. 2005). "[T]he law leans against the destruction of contracts for uncertainty, especially where one of the parties has performed his part of the contract." *Book-Mart of Florida, Inc. v. Nat'l Book Warehouse, Inc.*, 917 S.W.2d 691, 694 (Tenn. Ct. App. 1995); *see APCO Amusement Co. v. Wilkins Family Rests. of Am., Inc.*, 673 S.W.2d 523, 528 (Tenn. Ct. App. 1984).

We must first determine what, if any, contract existed between the parties, using an objective standard based on the parties' manifestations. We look first to the Amendment, which provides that, based on incomplete plans, RBI will manage the construction of the Project for Latham for a guaranteed maximum price of $650,000. Exhibit B to the Amendment lists the items considered in the maximum price and includes RBI's "Profit and Overhead" and contingencies. Notably, the "Amendment" does not actually amend any other valid contract, so its terms are limited to those stated therein. Subsequent to the execution of the Amendment, the building type was changed, rock was discovered where the foundation was to be laid, and other changes arose that affected the originally anticipated cost of the Project. Nevertheless, even after these problems arose and the plans had long been finalized, RBI sent out eight applications for payment, all reconfirming that the contract price for construction of the Project was $650,000, that there were no change orders, and that RBI was expected to pay for the items listed in Exhibit B of the Amendment.

The parties' testimony regarding the oral representations of Embury and Latham was contradictory. Embury testified that every time a change increasing the price of construction occurred, he informed Latham that there would be a price increase and Latham nevertheless directed him to proceed. Latham disputed this, testifying that Embury did not tell her that any of the changes would result in a higher contract price for her. Rather, she said, Embury indicated that the changes in the construction would save her money. Moreover, Embury concedes that he never discussed specific amounts with Latham during construction, and that Latham did not specifically state that she agreed to pay for items that would result in a contract price in excess of $650,000.

To the extent that the parties' testimony is contradictory, we must assume that the trial court implicitly credited Latham's testimony. The trial court's assessment of the credibility of the witnesses is, of course, accorded great deference on appeal. *See Mitchell v. Archibold*, 971 S.W. 2d 25, 29 (Tenn. Ct. App. 1998). With appropriate deference to the trial court's implicit determinations of credibility, we must conclude that the evidence does not preponderate against the

finding that the parties entered into a contract for the construction of the Project for a guaranteed maximum price of $650,000, which included the items listed in Exhibit B of the Amendment. In addition to the terms set out in the Amendment, the subsequent conduct of the parties was consistent with those stated terms that RBI agree to manage the construction of the Project for a maximum price of $650,000. Each of the eight applications for payment, generated by RBI, list the contract price as $650,000, and stated that there were no change orders during construction. The only evidence contrary to such an agreement is Embury's testimony that he informed Latham periodically of cost increases, and that she indicated to him that the Project should proceed despite the increase in cost. However, as noted above, Latham never specifically agreed to pay RBI an amount over $650,000, no change orders were ever signed, and there is no testimony that Embury ever discussed with Latham the amount of any such increases in cost until the construction was complete. Furthermore, RBI submitted into evidence only a portion of the invoices in support of its claim that Latham owes more than $650,000. Therefore, we find that the evidence does not preponderate against the trial court's finding that the parties had a meeting of the minds regarding the maximum contract price of $650,000, and that the items listed in Exhibit B were included in that price.

We must discuss separately RBI's claim related to equipment and furniture, because it is undisputed that those items were not covered in Exhibit B to the Amendment or in any of the applications for payment except for the final application. Indeed, most of the evidence on these items is essentially unrefuted in the record. Embury's testimony, Latham's testimony, and the trial exhibits all indicate that Latham intended to pay for equipment and furniture expenses out of the $250,000 "Design, Furniture and Equipment" portion of her Bank loan, not out of the $650,000 borrowed for the cost of construction. Campbell was paid over $100,000 for the equipment provided by his company, and he was paid out of the $250,000 portion of the loan. RBI's final application for payment, which included amounts for "Equipment" and "Furniture," resulted from RBI building the bars, completing the millwork, and installing the kitchen equipment. In the final application for payment, RBI invoiced Latham for these items, listing $6,527 for "Equipment" and $22,239 for "Furniture," for a total of $28,766. At trial, Latham conceded that payments for equipment and furniture were to be made out of the $250,000 portion of her Bank loan, and she did not dispute that RBI had performed the work related to these charges. It is apparent from the undisputed evidence that the $28,766 amount requested by RBI for these items should have been paid separately and should not have been taken from the $650,000 maximum contract price for construction costs.[9] Therefore, we reverse the trial court's finding on this component of RBI's claimed damages and remand to the trial court to enter a judgment in favor of RBI for $28,766 owed by Latham with respect to these items.

RBI claims that there was no contract between RBI and Latham, and that RBI therefore is entitled to the reasonable value of its services under a theory of *quantum meruit*. However, we have determined that the parties had an existing contract regarding the subject matter for which RBI seeks

---

[9]To the extent that RBI claims damages for furniture and equipment in addition to these amounts charged to Latham, we find the evidence insufficient to support RBI's claim.

to recover. Therefore, the doctrine of *quantum meruit* is inapplicable, and this argument must be rejected. ***See Swafford v. Harris***, 967 S.W.2d 319, 324 (Tenn. 1998).

Finally, RBI argues that the trial court erred in excluding from the evidence the March 4, 1999 letter indicating that the parties had an agreement for Latham to pay $80,113 in addition to the $650,000, because it related to an attempt to compromise or settle a disputed claim. The trial judge commented, "I just heard your client testify that he came up with a compromised figure just to get it out of the way. He assumed financial hardships and he felt lucky in getting a lesser amount and just get out. . . . This is all settlement compromise attempts on both parts."

Tennessee Rule of Evidence 408 provides:

Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount.

Tenn. R. Evid. 408.

We must conclude that the letter was properly excluded as evidence of an attempt to settle or compromise RBI's claim to additional funds. Embury testified that the letter memorialized the parties' agreement that Latham owed additional funds, and that it merely set out the terms of Latham's payment schedule. Embury also testified, however, that he reduced the full amount claimed because the restaurant was not doing well and he thought that his "best chance in getting the money out was to agree to her paying us our original fee." This indicates Embury's intent to compromise a claim that he thought was "reasonably expected to be disputed." In light of this, we affirm the trial court's decision to exclude the letter as evidence of compromise or settlement under Tennessee Rule of Evidence 408.

The decision of the trial court is affirmed in part, reversed in part, and remanded for the trial court to enter a judgment in favor of RBI for $28,766.00. Costs on appeal are to be taxed equally to Appellant Retail Builders, Inc., and its surety, and Appellee Margaret Latham, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE